357 F.2d 511
 David S. McDANIEL, doing business as McDaniel Plumbing & Heating Company, Appellant,
v.
ASHTON-MARDIAN COMPANY (Joint Venure) and The Travelers Indemnity Company, a corporation, Appellees.
 No. 20128.
 United States Court of Appeals Ninth Circuit.
 March 1, 1966.
 
 John P. Frank, of Lewis Roca, Scoville, Beauchamp & Linton, Phoenix, Ariz., for appellant.
 Hall, Jones, Hannah & Trachta, Ben C. Birdsall, Russell E. Jones, Tucson, Ariz., for appellees.
 Before MERRILL, Circuit Judge, MADDEN, Judge of the Court of Claims, and BROWNING, Circuit Judge.
 MADDEN, Judge:
 
 
 1
 This is a Miller Act Claim, 49 Stat. 794 (1935), 40 U.S.C. § 270b (1964), by a subcontractor against a general contractor and its bonding company (jointly referred to as appellee). The question of liability was presented on cross motions for summary judgment by the parties. The essential issue in the case is whether the appellant as a subcontractor is entitled to compensation for delay in the course of doing certain portions of a job undertaken by appellee as prime contractor for an agency of the Federal Government.
 
 
 2
 On the same day appellee entered into a contract with the United States Government for the construction of an Air Force Station at Ajo, Arizona, it executed a subcontract with appellant under which the appellant agreed to do the plumbing and heating work on the job. The subcontract was expressly made subject to the prime contract and also subject to certain "terms and conditions" set forth on the back of the subcontract. The prime contract contained standard government contract provisions granting the Government the right to make changes in the job specifications within the general scope of the contract and as necessitated by changed conditions. The subcontract recognized within its own provisions that changes and additions might delay the work. Relevant portions of the prime and subcontracts are set out in the margin.[1]
 
 
 3
 Under the prime contract it was contemplated that the work in question would take approximately 450 days; in fact the work took 196 days longer. The 196-day delay was the result in part of government change orders issued to the appellee and in part of other circumstances which need not be specified here. For the purposes of this appeal the delay may be considered as attributable entirely to the change orders. A total of thirty-nine change orders were submitted, three of which contained time extensions covering the delay period. Appellant did not receive any increase in the amount due on the subcontract by reason of these three change orders except the relatively minor amount of $242 on one of them. The parties have stipulated for the purposes of determining the issue of liability that as to at least a part of the delay period the appellant received no economic benefit therefrom.
 
 
 4
 Appellant remained substantially on schedule in its work and finished within the total time required for performance, including the additional 196 days. The practical effect of the delay period was that the work was performed over a substantially longer period of time than was originally contemplated and than would have been required had it not been for the change orders. Appellant was paid the subcontract price for the job and subsequently filed this action in the United States District Court for consequential damages alleged to have been caused by the delay. The parties thereupon agreed that appellee would pursue, for the benefit of appellant and other subcontractors, a claim for delay damages before the various government boards concerned, until administrative remedies had been exhausted. Since appellant was not in contractual relation with the United States, only appellee could seek administrative or judicial remedies against the Government. The procedure followed in cases like this is that the subcontractor, in effect, "borrows" the name of the prime contractor and then pursues relief through the administrative hierarchy in the name of the prime contractor, but for its own use and benefit.
 
 
 5
 Hearings were held before several administrative boards, all of which denied appellant any relief. Appellant then returned to the district court with its claim against appellee, which claim was denied in the decision from which appellant now appeals. The parties stipulated that appellant did not, itself, cause any part of the delay. The case is before us on the issue of liability alone.
 
 
 6
 Appellant appears to rest its claim against appellee on two bases, which, while they are closely related, we shall consider as a claim in tort and a claim in contract. The district court did not specifically deal with the tort claim, and we consider it first.
 
 
 7
 Both parties appear to agree that the general rule applicable to the tort aspect of appellant's claim is that a contractor delayed in his work through no fault of his own but by virtue of a wrongful act of the other contracting party is entitled to damages.[2] Appellant's theory, then, requires it to point to some wrongful act of appellee by which it has been damaged. It was stipulated by the parties that the delay period was caused by the change orders and other factors beyond appellee's control. Appellant recognizes that the Government was responsible for having made the changes and does not contest the Government's right under the contract to have done so. Appellant contends, however, that appellee, as prime contractor, must bear responsibility for having accepted the changes, and that this act of acceptance is the wrongful act which supports the subcontractor's right to damages under the general rule stated above.
 
 
 8
 Appellant's theory requires a brief explanation of the administrative procedure applicable to Government contracts such as the instant one. When the Government requests a change under contract provisions such as those involved here, the prime contractor may or may not assent to the proffered change order. If the change order is accepted, and if it provides for an increase or a decrease of the contract price, the contractor will be compensated for the changes as provided for in the order. Rejection of the proffered change order by the prime contractor because, for example, of dissatisfaction with the price offered by the Government merely calls into play another provision of the contract, viz., that the contractor will make the changes as directed and will be entitled to an "equitable adjustment" of the contract price.
 
 
 9
 The provisions of the prime contract here involved relating to changes are standard clauses in government construction contracts. They have been considered in many decisions which have consistently held that under them the Government has the right to make changes within the general scope of the contract or necessitated by changed conditions and incur no liability for delays resulting from such changes except for an equitable extension of the time for performance. United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942); United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 45 (1946). In the Rice case plaintiff was the receiver for a plumbing contractor, P. P had a prime contract for the plumbing, heating and electrical work for a veterans' home which was being built for the Government. Another contractor had a prime contract for preparing the site and constructing the building. Construction began, unsuitable soil conditions were discovered, and the site and specifications of the building had to be changed. P was not able to begin work until five months later than he had contemplated, and overhead expenses accumulated during the delay. P was paid the contract price upon completion of the work, and he then sued the Government for delay damages. The Supreme Court, reversing a judgment for P in the Court of Claims, held that the Government's exercise of its contract right to make changes, under change provisions substantially the same as those involved in the present case, could not amount to a breach of the contract. The Court concluded that under the contract the contractor was entitled only to the contract price adjusted in accordance with the direct expense of implementing the changes. No provision was to be made for consequential damages which might have resulted from the delay or the increased cost of the work not changed except for providing such an extension of the performance time as was necessary.
 
 
 10
 The construction of the Rice case has been consistently adhered to in recent Court of Claims decisions. Commerce International Company, Inc. v. United States, 338 F.2d 81 (1964); Gilbane Building Company v. United States, 333 F.2d 867 (1964); Laburnum Construction Corp. v. United States, 325 F.2d 451 (1963).
 
 
 11
 When it took its claim before the administrative boards, appellant recognized that the Rice line of authority appeared to prevent recovery from the Government. It therefore took the position before the boards that its claim fell within the "cardinal changes" exception to the Rice construction. Where an alteration can be shown to have been outside the scope of the original contract, the Rice construction will not apply, and appellant urged before the boards that the changes which called for adding certain "Arctic Towers" to the job, which changes were principally responsible for the delay, were cardinal changes.
 
 
 12
 The Board of Contract Appeals held, for two reasons, that the cardinal changes doctrine did not apply. First, on the facts, the disputed change was within the scope of the original contract; and, second, by reason of its acceptance of the change orders, the prime contractor, in whose shoes appellant stood, was estopped to claim after acceptance and performance that the changes were beyond the scope of the contract. Appellant then returned to the district court with the tort theory, which it now presents here, that because appellee's acceptance of the change orders estopped appellant from presenting its claim against the Government, that claim can now be pressed against appellee.
 
 
 13
 The court below, however, found, as did the administrative boards, that no cardinal changes were involved. Appellant does not challenge this finding, and this would appear to put to rest appellant's contention that it was injured by reason of any inability to proceed with its cardinal changes theory in the administrative hearings. It is equally clear that if appellee had refused to accept the change orders in question and had subsequently sued in the Court of Claims, not on a cardinal changes theory, but simply for the delay damages having accrued to it or its subcontractors, no recovery could have been had under the contract as interpreted by Rice. Acceptance of the change orders could in no way, therefore, have injured appellant, and its tort claim is without merit.
 
 
 14
 The other basis for appellant's claim is that the subcontract itself should be interpreted to provide for the recovery sought apart from any theory of appellee's wrongdoing. Appellant contends in this regard that an interpretation of this contract which would give appellee the right to keep appellant on the job during periods of delay without compensation would lead to so manifestly unfair a result that such could not reasonably have been the intention of the parties. On the other hand, the interpretation which appellant claims is reasonable would result in a situation where appellee could recover nothing for delays caused by change orders it was obligated to carry out, yet would be liable to each of its subcontractors whose work was delayed by the changes. It is no answer to the equally obvious unfairness inherent in this result to say, as appellant does, that the prime contractor need not be paid delay damages because the prime is paid fully for the additional work causing the delay. Depending on the nature of the change order and the portion of the job the prime contractor is carrying out itself, it also stands to be damaged by delays, as were the contractors in United States v. Rice, supra, and United States v. Howard P. Foley Co., supra. If, for example, the appellee here had been doing its own plumbing instead of having subcontracted it to appellant, it might well have incurred the same damages which appellant alleges.
 
 
 15
 With regard to the interpretation of the subcontract, then, we agree with the opinion of the court below which stated:
 
 
 16
 The subcontract between the parties (Exhibit No. 2) does not expressly provide, or imply, that [appellant] would be able to complete its work under the subcontract within 450 days. In fact, it states that "The Sub-Contractor agrees to perform the work progressively as directed by the Contractor and complete the entire project in accordance with Plans and Specifications and as directed by the Contractor." The provision can mean only that [appellee is] accorded the right to direct and control the time and manner of doing the work covered by the subcontract.
 
 
 17
 Further, Paragraph 16 of the Terms and Conditions of the subcontract rendered applicable to [appellant] the terms of the General Contract between [appellee] and the United States (Exhibit No. 1); and Section 3 of the General Provisions of that Contract gave the United States the right to make changes within the general scope of the Contract without being obligated to defendants for any delay damages or for anything other than the direct costs of the additional work and equitable time extensions for any additional time required for performance of the changes.
 
 
 18
 These provisions of the subcontract and the General Contract make it clear that both [appellant] and [appellee] knew when they entered into the subcontract that it could very well happen that the work under the subcontract would not be completed within the 450 days specified in the General Contract; that changes might be made by the United States which would necessarily extend the performance period of the General Contract and, consequently, the performance period of the subcontract. Both [appellant] and [appellee] knew, also, that if any changes authorized by Section 3 and ordered by the United States should result in delay damages to [appellee], no compensation for such damages could be recovered by [appellee] from the United States. Hence, it is reasonable to conclude that [appellant] and [appellee] did not intend their subcontract to mean that [appellant] could recover damages from [appellee] for delays occasioned by proper change orders of the United States.
 
 
 19
 Potential damage from delay is inherent in any construction contract. If the delay results from action which the party causing the delay was authorized by the contract to take, it would be difficult, in any case, to justify the award of delay damages to another party to the contract. When the party causing the delay is the United States Government, and the contract is the standard government contract, it is impossible, in the face of the precedents which we have cited, to find an equitable reason why a prime contractor, without fault and without option and without right of reimbursement from the Government, should have to compensate his subcontractor for damages resulting from delayed performance.
 
 
 20
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 PRIME CONTRACT, GENERAL PROVISION
 * * * * *
 
 
 [3]
 CHANGES
 The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * *
 
 
 [4]
 CHANGED CONDITIONS
 The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. * * *
 SUBCONTRACT
 
 
 [1]
 The Sub-Contractor agrees to furnish all labor, material, equipment and tools to perform all work as described below, in accordance with the general conditions of the Contract (which is available for inspection at all times at the office of the Contractor) by the Owner and the Contractor and in accordance with the drawings and specifications prepared by Corps of Engineers, U. S. Army, hereinafter called the Architect-Engineer, all of which general conditions, drawings and specifications signed by the parties thereto are identified by the Architect-Engineer and form a part of the Contract between the Contractor and the Owner, dated March 30, 1956, and hereby becomes a part of this Contract for AIR FORCE STATION TM-181 at AJO, Arizona, for Corps of Engineers, U. S. Army, hereinafter called the Owner:
 
 
 [2]
 The Sub-Contractor agrees to perform the work progressively as directed by the Contractor and complete the entire project in accordance with Plans and Specifications and as directed by the Contractor
 * * * * *
 
 
 [4]
 The Contractor and Sub-Contractor agree to be bound by the terms of the Agreement, general conditions, drawings, and specifications as far as applicable to this Sub-Contract and also by the terms and conditions as set forth on the reverse side entitled "Terms and Conditions," which are specifically incorporated herein and made a part thereof
 * * * * *
 
 
 [6]
 The Sub-Contractor agrees to fully do and perform this work and in all things execute and complete this contract within the time herein limited for that purpose or within said term as it may be extended by reason of delay, changes, additions, or other reasons called for or allowed by the Contractor and Architect and/or Engineer. * * *
 * * * * *
 
 
 [16]
 Insofar as the same are applicable to the work covered in this Contract, the Sub-Contractor agrees to be bound to the Contractor by the terms of the General Contract between the Contractor and the Owner and the specifications in connection therewith and to assume toward the Contractor all obligations and responsibilities the Contractor by these documents assumes towards the Owner. In particular, but without limitation, the Sub-Contractor agrees: (1) That the determination of any disputed question made pursuant to the provisions of the General Contract and the general conditions, drawings, and specifications in connection therewith shall be binding upon the Sub-Contractor; and (2) the provisions of the General Contract with respect to the termination of the General Contract shall be applied to this Sub-Contract and shall be binding upon the Sub-Contractor; and (3) that in all respects the relationships of the Contractor and the Sub-Contractor are to be governed by the plans and specifications named above, by the agreement, and the general conditions of the General Contract so far as is applicable to the work thus sub-let
 
 
 [2]
 Appellant states in its opening brief, "We assume that there will be no serious issue on the general proposition that if a person contracts to do a job with the reasonable expectation that it will be done within a particular period of time, and if he is delayed in doing it through no fault of his own but by virtue of the act of the other contracting party, he is entitled to damages." Appellee accepts this statement of the rule, but it is clear, both from appellee's acceptance of the statement and from the cases and authorities cited in support of it by appellant, that the "act of the other contracting party" referred to is assumed to be a wrongful act. Otherwise the proposition would be too broad. After stating the rule and assuming that "there will be no serious issue" about it, appellant, however, takes issue with it, although not too seriously, by stating in its reply brief that its basic position is that a prime contractor is responsible to his subcontractor for delays when the subcontractor is in no way responsible for them, regardless of the cause of the delays. None of the authorities appellant refers to, however, supports the proposition that, absent express or implied contract provision therefor, the subcontractor can recover from the prime contractor for delays which are not caused by the fault of the latter