No. 01-430

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 69

KEENEY CONSTRUCTION,

       Plaintiff/Appellant,

    v.

JAMES TALCOTT CONSTRUCTION CO., INC.,
STATE OF MONTANA and SAFECO INSURANCE CO.,

       Defendants/Respondents.

APPEAL FROM:    District Court of the Fourth Judicial District,
                 In and for the County of Missoula,
                 The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

              Christian T. Nygren, Milodragovich, Dale, Steinbrenner & Binney, P.C.,
              Missoula, Montana

       For Respondents:

              J. Michael Young, Ugrin, Alexander, Zadick & Higgins, P.C., Great Falls,
              Montana

                           Submitted on Briefs: December 6, 2001

                                Decided:  April 4, 2002

Filed:

_____

Clerk

Justice Jim Regnier delivered the Opinion of the Court.

1¶ Keeney Construction filed a complaint against James Talcott Construction Company, Inc. (Talcott), for delay, disruption and extra work. Keeney filed an Amended Complaint seeking similar damages against the project owner, the University of Montana (the "UM"), and against Safeco Insurance Company (Safeco) under Safeco's surety bond issued to Talcott. The Fourth Judicial District Court, Missoula County, granted partial summary judgment in favor of Talcott and Safeco on all of Keeney's delay, disruption and interference claims that Keeney based on an allegation that it had an early completion date of October 31, 1996, and on a claim of an additional manhole. Keeney appeals and we affirm.

2¶ The following issues are dispositive of this appeal:

3¶ 1. Did the parties intend that Keeney should complete its work under the Subcontract by late December 1996?

4¶ 2. Do the express terms of the Subcontract bar Keeney's claims for delay?

5¶ 3. Did Keeney provide proper notice of its claims under the dispute resolution provision of the contract?

## BACKGROUND

6¶ On August 14, 1996, the University of Montana, in Missoula, Montana, solicited bids from contractors for a project known as the Family Housing Phase II ("Phase II"). On that same day, Keeney faxed a bid for site work items under the General Contract to

Talcott. The UM awarded the General Contract to Talcott on August 23, 1996. The General Contract contained an initial completion date of May 31, 1997.

7¶ On August 27, 1996, representatives from Keeney and Talcott attended a preconstruction meeting to discuss issues that could affect the project's success. At the meeting, Talcott's project manager presented a preliminary bar chart schedule that showed a September 3 start date and a December 1996 finish date. Two days later, on August 29, 1996, Keeney and Talcott entered into a Standard Subcontract Agreement (the "Subcontract"). Under the Subcontract, Keeney agreed to prepare the initial site, install water and sewer lines, prepare subgrade for roads and parking areas and pour concrete curbs, gutters and sidewalks.

8¶ Jerry Taylor, the project architect, sent a letter, dated September 10, 1996, to Talcott stating that the UM did not want an early completion date. In the letter, Taylor also requested that Talcott prepare a schedule to reflect the full contract period. On October 24, 1996, the UM and Talcott entered into a change order, which added three additional four-plex units to the project ("Phase III") and extended the overall completion date to July 31, 1997. The change order also extended the completion date for Phase II by a month, to June 30, 1997. Keeney did not do any work on Phase III. Some dispute remains about when Keeney finally completed its portion of the work, but Taylor ultimately issued a Certificate of Substantial Completion on October 1, 1997.

9¶ On July 23, 1998, Keeney filed a complaint against Talcott for various damages, including delay and extra work. Talcott filed an Answer on September 30, 1998 and an

Amended Answer on October 9, 1998. On February 24, 1999, Keeney amended its Complaint to include the State of Montana, through the UM, and Safeco as defendants. On August 3, 2000, Talcott and Safeco filed a Motion for Partial Summary Judgment against Keeney's claims that it had an early completion date of October 31, 1996, and three claims that it performed extra work. The UM subsequently filed a Motion for Summary Judgment on September 22, 2000. In an order dated October 11, 2000, the District Court granted the Motion for Partial Summary Judgment and the UM's Motion for Summary Judgment. Keeney appeals the portion of the court's Order granting partial summary judgment to Talcott and Safeco but does not appeal the portion granting summary judgment to the UM.

## STANDARD OF REVIEW

10¶ We review a district court's order granting summary judgment *de novo,* applying the same evaluation as the district court pursuant to Rule 56, M.R.Civ.P. *See Vivier v. State Dep't of Transp.*, 2001 MT 221, ¶ 5, 306 Mont. 454, ¶ 5, 35 P.3d 958, ¶ 5; *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. In *Bruner,* we stated that:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

*Bruner,* 272 Mont. at 264-65, 900 P.2d at 903 (citations omitted).

¶11 Did the parties intend that Keeney should complete its work under the Subcontract by late December 1996?

¶12 We must interpret the intent of parties to a contract from only the contract when the terms are unambiguous. *See Habets v. Swanson*, 2000 MT 367, ¶ 13, 303 Mont. 410, ¶ 13, 16 P.3d 1035, ¶ 13. "An ambiguity exists when the contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations." *Wray v. State Compensation Ins. Fund* (1994), 266 Mont. 219, 223, 879 P.2d 725, 727 (quoting *Morning Star Enters. v. R.H. Grover, Inc.* (1991), 247 Mont. 105, 111, 805 P.2d 553, 557). Whether a contract is ambiguous is a question of law that a court must decide. *See Carelli v. Hall* (1996), 279 Mont. 202, 209, 926 P.2d 756, 761.

¶13 Here, the language of the Subcontract contains no ambiguity. The Subcontract stated that Keeney agreed "[t]o complete the work of this Subcontract as required by job progress or within the following time limits: As directed by James Talcott Construction, Inc. Time is of the essence on this project." The Subcontract, therefore, clearly states that Keeney agreed to work at the direction of Talcott. Although the General Contract initially set May 31, 1997, as the overall completion date of Phase II, the Subcontract governs "[w]here any provision of the General Contract Documents between the Owner and the Contractor is inconsistent with any provision of this [Subcontract]." Thus, the Subcontract clearly authorized Talcott to set Keeney's completion schedule. *Cf. McDaniel v. Ashton-Mardian Co.* (9th Cir. 1966), 357 F.2d 511, 516 (interpreting a

contract, which stated that a subcontractor agreed to complete a project "as directed by the Contractor," to mean that the contractor had the right to direct and control the time of doing the work).

14¶ In order for a December 1996 completion date to apply to Keeney, the parties would have had to modify the subcontract. Keeney argues that the minutes of the preconstruction meeting did just that. During that meeting, the parties discussed a completion date of late December 1996. We will only use extrinsic evidence of a prior oral agreement to determine the parties' intent, however, where an ambiguity exists in the contract. *See Doble v. Bernhard*, 1998 MT 124, ¶ 19, 289 Mont. 80, ¶ 19, 959 P.2d 488, ¶ 19. Otherwise, if courts allowed parties to introduce extrinsic evidence about terms of their contract, the contracting parties would be "under a cloud of uncertainty" as to whether they could rely on a written contract. *Sherrodd, Inc. v. Morrison-Knudsen Co.* (1991), 249 Mont. 282, 286, 815 P.2d 1135, 1137.

15¶ Keeney argues that admitting the minutes of the preconstruction meeting would further the policy stated in *Sherrodd* by lifting the cloud of uncertainty surrounding its work on Phase II. There is no dispute that a construction project, particularly on the scale as that of Phase II, is a complicated undertaking. The preconstruction meeting doubtlessly helped to alleviate any confusion surrounding the project. Keeney explicitly agreed in the Subcontract, however, to complete its work at the direction of Talcott. If the parties wished to memorialize a December 1996 completion date, they could easily have included this date in the Subcontract. In fact, the language of the Subcontract

specifically allowed the parties to reference any additional documents; it stated that "[t]his Subcontract, together with riders ___, ___, ___, (attached hereto or enclosed herewith) and made a part hereof, constitutes the entire understanding of the parties and supersedes any prior proposals or agreements." The parties, however, attached no riders to the contract. Therefore, because the language of the Subcontract is clear, Keeney may not rely on extrinsic evidence to support its contention that the parties intended a December 1996 completion date.

16¶ Alternatively, Keeney argues that the preconstruction meeting minutes, along with various conversations, represented an executed oral agreement, which modified the written contract. The preconstruction meeting, however, took place two days before Talcott and Keeney executed the Subcontract. Modifying a contract that the parties have not yet entered into is logically impossible.

17¶ Furthermore, the parties must fully execute an oral agreement in order for it to modify a written agreement. *See* § 28-2-1602, MCA; *Westfork Constr. Co. v. Nelcon, Inc.* (1994), 265 Mont. 398, 402, 877 P.2d 481, 484. We have previously held that parties may essentially execute an oral agreement to extend the time of performance through conversations. *See Doble*, ¶ 26. In that case, however, the lawsuit arose before the new, extended deadline arrived. Here, if Talcott and Keeney fully executed an oral agreement to complete Keeney's work on Phase II by the end of December 1996, the need for this lawsuit would not exist. *Cf. Sherrodd,* 249 Mont. at 286, 815 P.2d at 1137

8

(stating that the existence of an executed oral agreement would have negated the reason for the lawsuit).

18¶ For these reasons, we conclude that the parties did not agree to an early December 1996 completion date.

## ISSUE TWO

19¶ Do the express terms of the Subcontract bar Keeney's claims for delay?

20¶ After the District Court concluded that the parties had not agreed to an early completion date, it held that Keeney could not recover damages for delay from Talcott because Keeney worked "as directed" by Talcott. While Keeney and Talcott both point to various non-Montana cases in support of their positions, no clear consensus exists between these jurisdictions about whether a subcontractor working "as directed by" the general contractor may seek damages for delay. *Compare, e.g., McDaniel,* 357 F.2d 511; *with Blake Constr. Co. v. C.J. Coakley Co.* (D.C. 1981), 431 A.2d 569 (concluding that a general contractor breached an implied condition of performance by hindering the subcontractor's performance and unreasonably sequencing work despite a contract provision that the subcontractor worked "as directed" by the general contractor).

21¶ The only Ninth Circuit case cited by the parties, *McDaniel,* involved a similar situation to the one before us where a subcontractor worked "as directed" by the general contractor. In concluding that the subcontractor could not receive an award of delay damages, the *McDaniel* court held that the "as directed" language accorded the general contractor the right to direct the time and manner of the subcontractor's work. *See*

9

*McDaniel*, 357 F.2d at 516. Similarly, the Subcontract now in dispute authorized Talcott to direct the timing of Keeney's work. As we discussed, the parties did not amend this language.

22¶ Keeney insists that to bar it from recovering damages for delay would amount to enforcing an exculpatory clause, which it argues is contrary to Montana law. We have previously held that an entity may not contract to exempt itself from a negligent or willful violation of law, including negligent violations of legal duties. *See Miller v. Fallon County* (1986), 222 Mont. 214, 221, 721 P.2d 342, 346-47. In that case, a party contracted to waive all liability toward the other party. *See Miller*, 222 Mont. at 219, 721 P.2d at 345-46. Here, however, the contract does not exculpate Talcott from all liability; rather, it simply authorizes Talcott to direct the timing for completion. The contract set no limit on Talcott's ability to do this. Therefore, we agree with the District Court's conclusion that Keeney cannot assert a claim for damages under the facts presented in this case.

### ISSUE THREE

23¶ Did Keeney provide proper notice of its claims under the dispute resolution provision of the contract?

24¶ In addition to damages for delay, Keeney also sought damages for the installation of an additional manhole. The District Court concluded that Keeney's failure to request a pass through claim from Talcott, as required under the contract, barred it from later raising the claim in court. Keeney insists that it discussed these claims with Talcott, but

10

Talcott never pursued them. Therefore, Keeney maintains that a genuine issue of material fact remains about whether Keeney followed or attempted to follow the proper procedures under the General Contract. We disagree.

25¶ The Subcontract states that the subcontractor agrees to "give notice to the Contractor of all claims for extras, for extensions of time and for damage for delays or otherwise, promptly and in accordance with the Contract Documents." Turning to the General Contract, it states that "[c]laims must be made by written notice." By Keeney's own admission, it never submitted a written claim. In his deposition testimony, Ron Keeney, the primary owner of Keeney Construction, stated that the parties "had some discussions about [the pass through claims], and that's as far as it went." Regardless of whether Talcott was receptive to Keeney's oral claims of damages, it was Keeney's duty under the contracts to submit a written claim to Talcott. Keeney never did this. Therefore, we conclude that Keeney did not follow the proper procedures for presenting a claim. Because Keeney never validly presented a claim, we need not address the issue of Keeney's failure to request arbitration concerning that claim.

26¶ Finally, Keeney also asserts that its failure to understand the May 31, 1997, completion date constituted a mistake and we should therefore revise the contract. Talcott counters that we should dismiss this argument because Keeney raises it for the first time on appeal. Keeney does not dispute Talcott's argument. The general rule in Montana is that we will not address an issue a party raises for the first time on appeal. *See Unified Indus., Inc. v. Easley,* 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d

11

100, ¶ 15; *Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866. The rationale behind this rule is that faulting a trial court for failing to rule correctly on an issue it was never given the opportunity to consider is fundamentally unfair. *See Unified Industries,* ¶ 15. Therefore, we decline to address the issue of mistake.

27¶ Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ PATRICIA COTTER

/S/ W. WILLIAM LEAPHART
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE